1  Roberto J. Kampfner  (SBN 179026)
   Andrew Mackintosh   (SBN 266772)
2  WHITE & CASE LLP
   555 South Flower Street, Suite 2700
3  Los Angeles, CA 90071
   Telephone:  (213) 620-7700
4  Facsimile:   (213) 452-2329
   rkampfner@whitecase.com
5  amackintosh@whitecase.com

6  *Attorneys for Plaintiff*

7

8                  **UNITED STATES DISTRICT COURT**
                 **NORTHERN DISTRICT OF CALIFORNIA**

9
   FORRESTSTREAM HOLDINGS LIMITED, a      | Case No. 3:16-cv-01609-LB
10 Cyprus company,                        |
                                          | ***EX PARTE* APPLICATION FOR**
11           Plaintiff,                    | **(A) APPOINTMENT OF A**
                                          | **RECEIVER FOR LIMITED**
12      v.                                | **PURPOSE OF FACILITATING**
                                          | **MARKETING FOR 28 MEADOW**
13 GREGORY SHENKMAN (AKA GRIGORY          | **HILL; AND (B) INJUNCTION**
   SHENKMAN), an individual,              | **RESTRAINING JUDGMENT**
14                                        | **DEBTOR FROM CAUSING**
             Defendant.                    | **INJURY TO THE PROPERTY;**
15                                        | **ORDER TO SHOW CAUSE WHY**
                                          | **RELIEF SHOULD NOT BE**
16                                        | **CONFIRMED**

17                                        | **Fed. R. Civ. P. 69(a)(1);**
                                          | **Cal. Code Civ. P. §§ 568, 699.070(a),**
18                                        | **708.610, 708.620, and 745(b)**

19                                        | Action filed:       March 31, 2016
                                          | Judgment Entered:   April 6, 2017
20
                                          | Hearing Date & Time:    *Ex Parte*
21

22 **TO THE HONORABLE LAUREL BEELER, UNITED STATES MAGISTRATE JUDGE:**

23

24      Plaintiff and judgment creditor Forreststream Holdings Limited ("**Forreststream**") files

   this application pursuant to sections 568, 699.070(a), 708.610, 708.620, and 745(b) of the
25
   California Code of Civil Procedure (the "**CCP**"), made applicable in this action pursuant to
26
   Rule 69(a)(1) of the Federal Rules of Civil Procedure (the "**Federal Rules**").  This application is
27
   made on an *ex parte* basis in accordance with CCP § 699.070(a), which authorizes the Court to
28

                                      - 1 -

1   appoint a receiver on an *ex parte* basis where the Court determines such appointment (a) is

2   necessary to preserve the value of property levied upon; and (b) would best serve the interests of

3   the parties.  As further set forth herein, there is a substantial basis for the Court to so determine.

4   Forreststream further requests that the Court order Shenkman to show cause why the relief

5   requested should not be confirmed at a hearing on March 22, 2018 or such other time and date as

6   the Court may direct.

7       The factual basis for this application is the record in this action and the declarations of

8   Andrew Mackintosh (the "**Mackintosh Declaration**"), William N. Bullock (the "**Bullock**

9   **Declaration**"), and G. Larry Engel (the "**Engel Declaration**"), each filed concurrently herewith.

10  <u>**POINTS AND AUTHORITIES IN SUPPORT OF APPLICATION**</u>

11      On December 6, 2017, the Court entered an order authorizing the sale of Shenkman's

12  claimed homestead—a multi-million dollar custom home sited atop a hill in Tiburon with views

13  of San Francisco—with net proceeds to be applied to pay down Forreststream's judgment.  As

14  required by California law, the Court set a minimum amount at which the sale could close absent

15  further order.  This amount, filed under seal, is set at 90% of the judicially-determined market

16  value for the property.

17      Under any circumstances, generating bids for 90% of market value at an execution sale

18  poses a substantial challenge.  For example, execution buyers are required to pay their bid price in

19  cash within ten days of the auction.  In a conventional sale, buyers can condition their obligation

20  to perform on obtaining financing and have adequate time to arrange it.  Further, execution buyers

21  take the property on an as-is basis at the time of sale and may be limited only to public records for

22  their pre-sale diligence.  In a conventional sale, buyers have broad inspection rights and are

23  assured that the property will be delivered in the same condition as it was shown to them.  These

24  and other factors necessarily depress what buyers are willing to pay at execution sales.

25      The challenge of achieving the 90% threshold is magnified here due to the high value and

26  unique nature of the property.  First, the market for properties like Shenkman's is far smaller than

27  it is for the typical homestead.  There are fewer buyers in the $5 million to $10 million market

28  than there are in the $1 million market.

1    Second, market participants have less certainty about the actual value of a home like

2    Shenkman's than they would about, say, a condominium.  A condominium is easy to price based

3    on historical sales of similar properties—perhaps even equivalent units in the same complex.  As

4    evidenced by the range of appraisals filed in this case—from $5.5 million to $9.5 million—

5    pricing Shenkman's home is not easy.  The style, configuration, and condition of the property

6    play a substantial part in this.  To avoid being burned, potential buyers without access to the

7    property or certainty about its condition as of the sale date will need to assume the worst and bid

8    accordingly.

9    Forreststream sought to alleviate the uncertainty through a process whereby potential

10   bidders at the auction would be able to view Shenkman's property.  It engaged Sotheby's Golden

11   Gate International Realty ("**Sotheby**") to promote the auction and requested that Shenkman

12   separately enter into a listing agreement with Sotheby to generate interest for a consensual sale.

13   Under this arrangement, Sotheby would have been able to show the property to any potential

14   bidder or buyer and, if a conventional buyer made an adequate offer, the parties could have

15   canceled the auction and proceeded with a consensual sale.

16   Shenkman refused Forreststream's proposal, pledging to "shut the door" to potential

17   buyers as long as an auction for the property is on calendar.  Shenkman is keenly aware that

18   shutting the door on potential buyers may preclude bids in the minimum amount set by the Court.

19   By attempting to ensure that no such bids are submitted, Shenkman hopes to extend his time in

20   his home, where he is currently living at Forreststream's expense.

21   Importantly, Shenkman stopped paying the mortgage on his house on or about September

22   1, 2017.  The non-default interest and late fees on that mortgage accrue at a rate of nearly $20,000

23   per month and Shenkman is in arrears by more than $220,000.  On March 6, 2018, the lender

24   recorded a notice of default on the property.  This is the first step in the public foreclosure process

25   and means that the lender could foreclose out Shenkman and Forreststream's judgment lien as

26   early as June 25, 2018.  It also indicates that the lender may assert the right to default interest—

27   retroactive to September 2017—at a rate of 18%.  At this rate, the interest and fee accrual would

28   approach $70,000 per month.  Given that Shenkman has indicated he has insufficient assets to

- 3 -

1    satisfy Forreststream's judgment, accretion of senior debt on the property directly reduces

2    Forreststream's likely recovery and comes at Forreststream's expense.  In any event, with the

3    foreclosure process ongoing, there is no time for a consensual sale process.

4        This is just one reason that Shenkman's insistence that any auction be preceded by a pure

5    conventional sale process (of an indeterminate length) in exchange for his cooperation is

6    unacceptable and unreasonable under the circumstances.  As the Court is aware, only an auction

7    of the property, and not a consensual sale process, can extinguish junior liens.  As of the date of

8    this filing, the IRS asserts a junior lien in the property of nearly $600,000.  Forreststream

9    anticipates that an additional junior lien in the amount of $4,500,000 will soon attach on account

10    of a second judgment rendered against Shenkman in California state court.  No consensual sale

11    could possibly generate sufficient proceeds to satisfy all of these obligations.  An auction is

12    therefore the only path forward.

13        In light of this reality, Forreststream makes this application in support of its efforts to

14    conduct a value-maximizing sale process under the circumstances—and one with some

15    meaningful chance of yielding a bid in excess of 90% of the judicially determined market value.

16    Forreststream requests that the Court appoint a receiver with the narrow authority to facilitate

17    showings and other marketing of the property and enjoin Shenkman from causing damage to the

18    property.  This relief would address two value-depressing aspects of the auction process relative

19    to a conventional sale, i.e., uncertainty about the style, quality, and current condition of the

20    property and uncertainty about its condition on the date of the sale.

21        Forreststream requests that the Court grant the application and enter the order attached

22    hereto (the "**Proposed Order**").

23      **A.  Background**

24         **1.  The Judgment**

25        This application is made in furtherance of Forreststream's efforts to collect on its

26    judgment [D.I. 109] (the "**Judgment**") against Gregory Shenkman entered by the Court on April

27    6, 2017 in the aggregate amount of $10,514,420.77.  On July 11, 2017, the amount of the

28    Judgment was reduced to $6,302,544.53 as result of Forreststream's foreclosure on some of

1    Mr.Shankman's stock. Interest accrual increases the Judgment at a rate of $177.16 per day.  ECF

2    No. 211.  As a result of certain sales of real property conducted by the U.S. Marshal on February

3    21, 2018, Forreststream estimates that the judgment will be further reduced by approximately

4    $1 million.  Mackintosh Decl. ¶ 3.  It is presently awaiting payment of the proceeds of such sales.

5    *Id.*  Shenkman has neither made nor offered any cash payment on account of the Judgment.  All

6    reduction in the outstanding amount of the Judgment is the result of Forreststream's enforcement

7    efforts to date.

8                                **2.  Planned Sale of 28 Meadow Hill to Enforce the Judgment**

9                    Pursuant to the writ of execution entered by this Court on May 17, 2017, Forreststream

10   instructed the U.S. Marshal for the Northern District of California to levy on Shenkman's interest

11   in the dwelling commonly known as 28 Meadow Hill Drive, Belvedere-Tiburon, CA 94920 and

12   identified by the Marin County Recorder-Assessor as parcel 058-341-15 (the "**Property**").  On

13   July 14, 2017, the U.S. Marshal recorded the notice of levy and a copy of the writ of execution

14   with the office of the Marin County Recorder, identified as instrument 2017-027948.

15                   On August 9, 2017, Forreststream filed its Ex Parte *Verified Application for Issuance of*

16   *an Order of Sale of Dwelling; Order to Show Cause Why Order for Sale of Dwelling Should Not*

17   *Issue (28 Meadow Hill)* [D.I. 141] (the "**Sale Motion**").  The purpose of the Sale Motion was to

18   obtain authority to sell the Property.

19                   In support of the Sale Motion, Forreststream submitted an appraisal prepared by Sheri

20   Hill, a Certified Residential Appraiser, estimating the fair market value of the Property to be

21   approximately $5,500,000.  As reflected in her appraisal, Ms. Hill was unable to perform an

22   inspection of the Property and was left to rely on public records and make reasonable assumptions

23   to estimate its worth.  ECF 141-1, 39-40.

24                   On September 21, 2017, the Court entered an order [D.I. 172] determining that the

25   Property is Shenkman's homestead and fixing the amount of the homestead exemption at

26   $100,000.  On December 6, 2017, the Court entered an order [D.I. 234] granting the Sale Motion

27   (as corrected [D.I. 248], the "**Sale Order**").  Pursuant to CCP § 704.780(b), because the Property

28   was found to be Shenkman's homestead, the Court valued the Property in the Sale Order.

1    To assist the Court in making the value determination, it appointed Thomas Markovich, a

2    Certified Residential Appraiser.  Mr. Markovich concluded that the value of the Property is

3    $6,200,000.  ECF 223 at 13.  Forreststream and Shenkman agreed to have a second appraisal of

4    the Property conducted by another Certified Residential Appraiser, Mark Lindsay.  Mr. Lindsay

5    concluded that the Property is worth $9,000,000.  Both Mr. Markovich and Mr. Lindsay had full

6    access to the property.

7    Subsequent to December 6, 2017, Forreststream and Shenkman engaged in some

8    discussion regarding a sale process for the Property.  Throughout these discussions, Shenkman

9    has indicated a willingness to cooperate only in a conventional sale process—one in which a real

10   estate broker would enter into a listing agreement with the Shenkmans to sell the Property on

11   their behalf on a schedule deemed reasonable to Shenkman.  *See* ECF 214, 4:15-21.

12   Forreststream identifies at least three obstacles to a conventional sale process.  First, time

13   is of the essence and Shenkman has shown no sense of urgency.  Shenkman has known that the

14   Property would be sold to satisfy the Judgment not later than August 2017 when Forreststream

15   filed the Sale Motion.  Indeed, Shenkman recognized or should have recognized this at least as

16   early as April 6, 2017 when the Court entered the Judgment and Shenkman purportedly lacked

17   sufficient liquid assets to satisfy it.  Shenkman could have listed the Property for sale through a

18   listing agent at any time during the eleven months between April 2017 and the date of this

19   application and conducted the process in the manner that he considered value maximizing.  He

20   didn't.  This is because Shenkman wants to keep his house as long as he can—especially since he

21   is now living there for free and at Forreststream's expense.

22   Forreststream learned in January 2018 that Shenkman has not paid the mortgage on the

23   Property since on or about August 1, 2017.  Mackintosh Decl., ¶ 4.  As of August 31, 2017,

24   approximately the last date on which Shenkman was not in default on the mortgage, the

25   outstanding balance was $4,484,128.46.  *See* ECF 163-1 at 19.  The non-default interest rate on

26   the mortgage is 4.625%.  *Id.*

27   Importantly, the deed of trust securing the mortgage on the Property, recorded as Marin

28

AMERICAS 94301920

County Recorder Instrument 2005-0094101 (the "**Deed of Trust**")[1] provides as follows:

> If Borrower shall fail to make any payment of principal and/or interest when due hereunder, or if maker shall default under the Security Instrument, then Lender, at its option may declare due and payable immediately the unpaid balance of principal together with interest accrued thereon at the applicable rate specified above to the date of default, and after that date at a "default rate" which shall be eighteen percent (18%) per annum.

Deed of Trust, Rider to Security Agreement (final page of document).  At 18% per annum on a principal balance of $4.5 million, the monthly interest accrual would increase to $67,500 (not including late fees and other charges).  Because the mortgage is senior to Forreststream's judgment lien, it must be paid before Forreststream can realize any recovery from the Property. *See* Sale Order, ECF 248, 4:26-5:5.  Therefore, assuming Shenkman's mortgage lender elects to charge default interest, **every month that passes before the property is sold will likely cost Forreststream approximately $70,000.**

The servicer of Shenkman's mortgage recorded a notice of default on March 6, 2018.  A true and correct copy of the notice of default is attached to the Mackintosh Declaration as **Exhibit B**.  The notice of default declared all amounts under the deed of trust immediately due and payable.  Mackintosh Decl. Ex. B at 3.  The current arrearage on the mortgage, calculated at the non-default rate, stands at $223,047.23.  *Id.* at 1.  Under California law, a foreclosure sale may be conducted as few as 111 days of the date of the notice of default.[2]  As such, Shenkman's mortgage lender could foreclose as soon as June 25, 2018.  In a foreclosure sale, Forreststream's judgment lien would be eliminated and Forreststream would receive only amounts in excess of all obligations owed to the lender in the unlikely event of a cash sale to a third party in the foreclosure process.[3]  Even without regard to the impact of the interest accrual on Forreststream's

---

[1]     A true and correct copy of the Deed of Trust is attached to the Mackintosh Declaration as **Exhibit A**.

[2]     *See generally* Foreclosure – foreclosure, *available at* http://www.courts.ca.gov/1048.htm.

[3]     Assuming a foreclosure sale on July 1, 2018, obligations to the lender would likely exceed $5.2 million if it elected to impose default interest.  The lender has no incentive to obtain more for the property than the amount of its debt and has no duty to perform marketing beyond bare legal notices.  Foreclosed homes are frequently sold to their lenders for the amount of the outstanding debt and become "REO" properties that are then sold by the lenders who are able to retain any excess amounts realized in a market sale.

- 7 -

1    recovery, there is simply no time for a "conventional" sale process with foreclosure imminent.

2         The second obstacle to a conventional sale process is the asserted $576,984.62 IRS tax

3    lien recorded in Marin County on July 17, 2017 as instrument 2017-0028241.[4]  Forreststream's

4    April 11, 2017 judgment lien and July 14, 2017 execution lien are both senior to the IRS tax lien

5    such that the IRS tax lien can be eliminated in an execution sale of the Property.[5]  Thus, all else

6    being equal, a conventional sale would need to net at least $600,000 (plus any additional accrued

7    interest) more than an execution sale made the same day for it to be more favorable to

8    Forreststream.

9         The third obstacle is that a tort judgment in the aggregate amount of $4,500,000 was

10   entered against Shenkman on or about January 11, 2018.  The judgment creditor recorded her

11   abstract of judgment in San Mateo County on January 31, 2018, which was recorded as San

12   Mateo County instrument 2018-006353.[6]  The judgment creditor could record her abstract of

13   judgment in Marin County at any time, thereby imposing a $4.5 million junior lien on the

14   Property at any time.  Should this occur (and Forreststream knows of no reason why it would

15   not), a conventional sale would need to net at least $5.1 million more than an execution sale made

16   the same day for it to be more favorable to Forreststream.

17        Under these circumstances, it is inconceivable that a conventional sale, closing before

18   June 25, 2018, would yield sufficient proceeds to satisfy all likely encumbrances on the Property

19   _____

20   [4]    A true and correct copy of this document is attached to the Mackintosh Declaration as
     **Exhibit C**.

21   [5]    *See Quality Loan Serv. Corp. v. 24702 Pallas Way*, 635 F.3d 1128 (9th Cir. 2011)
     (priority of federal tax liens and state created liens is determined by federal law which, absent

22   provisions to the contrary, follows common law principle of first in time, first in right); CCP
     § 701.630 (subordinate liens eliminated by sale pursuant to CCP § 701.570); 26 CFR 301.7425-1

23   ("A tax lien of the United States . . . may be discharged or divested under local law only in the
     manner prescribed in section 2410 of title 28 of the United States Code or in the manner

24   prescribed in section 7425 of the Internal Revenue Code."); 26 U.S.C. § 7425(b) (sale of property
     on which the United States claims a lien, made pursuant to an instrument creating a lien on such

25   property "pursuant to a nonjudicial sale under a statutory lien on such property" can be made free
     and clear of a junior IRS lien only with 25 days' special notice to the IRS); 26 CFR 301.7425-

26   2(c), Example 1 ("[A]n execution sale is a nonjudicial sale described in section 7425(b) because
     the sale is made pursuant to a statutory lien on the property sold.").

27   [6]    A true and correct copy of this document is attached to the Mackintosh Declaration as
     **Exhibit D**.  On February 21, 2018, the U.S. Marshal sold two condominiums located in San

28   Mateo County free and clear of the liens created by such document pursuant to CCP § 701.630.

- 8 -

1   and return money to Forreststream.[7]  An auction is therefore the only path forward.  An auction

2   for the Property (the "**Auction**") is currently scheduled for April 27, 2018 at 10:00 a.m.

3

### 3.  Forreststream's Efforts to Market the 28 Meadow Hill Auction and Shenkman's Refusal to Cooperate

4

5       Recognizing the necessity of the Auction, Forreststream entered into that certain Auction

6   Marketing Agreement dated February 13, 2018 (the "**Sotheby Agreement**") with Sotheby, a true

7   and correct copy of which is attached to the Mackintosh Declaration as **Exhibit E**.  Forreststream

8   selected Sotheby to promote the Auction because of its high profile in the Marin County real

9   estate market, its international reach, and the fact that Sotheby brokers Bill Bullock and Lydia

10  Sarkissian represented the seller of 30 Meadow Hill—the home next door to the Property—in

11  connection with its May 2017 sale for $10 million.  *See* ECF 226, 5.  Further, Ms. Sarkissian is

12  personally familiar with the Shenkman Property, having represented the sellers of the Property in

13  their sale to the Shenkmans in the 1990s.

14      Pursuant to the Sotheby Agreement, Sotheby agreed, "[t]o the extent practicable, [to]

15  advertise the Auction in substantially the same manner as it would advertise a luxury home in

16  Marin County, California listed for sale pursuant to a conventional listing agreement."  *Id.* at § 3.

17  The Sotheby Agreement further obligated Sotheby to solicit a conventional listing agreement with

18  the Shenkmans, subject to limited special conditions, including that, under such a listing

19  agreement, "the Shenkmans [would] provide access to persons interested in participating in the

20  Auction to the same extent as provided for Prospective Buyers under the [listing agreement]."  *Id.*

21  at § 2(a).

22      Andrew Mackintosh, counsel to Forreststream, forwarded the executed Sotheby

23  Agreement to Walter Cook, counsel for Shenkman, on February 13, 2018, and received no

24  response.  Mackintosh Decl., ¶ 9.  Al Cordova, counsel for Sotheby, attempted to reach counsel

25  for Shenkman shortly thereafter.  Shenkman ultimately agreed to have a call on February 21,

26  _____

[7]      Estimating the mortgage at $5 million, the tax lien at $600k, the anticipated junior

27  judgment lien at $4.5 million, and the Shenkman homestead exemption at $100k, a conventional sale with a 5% broker's commission would need to clear $10.75 million for Forreststream to

28  receive any value at all.  None of the appraisals filed in this case suggest that this price is possible.

AMERICAS 94301920

1    2018 to discuss the Sotheby Agreement and Forreststream's proposed dual-track

2    auction/conventional listing process.  Present on the call were (a) Shenkman, (b) counsel to

3    Shenkman, (c) counsel to Sotheby, and (d) counsel to Forreststream.  *Id.* at ¶ 10.

4         On the February 21 call, Shenkman unconditionally rejected Forreststream's proposed

5    dual track process.  *Id.*   First, he rejected the notion that Sotheby could effectively represent the

6    Shenkmans under a conventional listing while simultaneously performing under the Sotheby

7    Agreement.  Second, and more fundamentally, he rejected any process whereby the Property is

8    both scheduled for auction and listed for sale under a conventional listing agreement.  *Id.*  He

9    stated that he would cooperate only in a "sequenced" process that began with a conventional

10   listing of the Property with no auction set for some period of time.  *Id.*  Shenkman suggested that

11   nine months would be the minimum appropriate period for the conventional listing under ordinary

12   circumstances but did not say on the call how many months he wanted under present

13   circumstances.  *Id.*  Instead, he promised to propose a pre-auction conventional marketing period

14   to Forreststream in writing.  As of the date of this application, more than two weeks later,

15   Forreststream has received no such proposal from Shenkman.[8]

16        If his demand for a "sequenced" process was not met, Shenkman stated that he would not

17   cooperate in any way and would "shut the door" to Forreststream and potential bidders for the

18   Property at the Auction.  *Id.*  In doing so, Shenkman acknowledged that the lack of access would

19   impair the chances of the Property selling for the Court-fixed minimum price at the Auction.

20        In order to promote a value-maximizing Auction, Forreststream requests that the Court

21   (i) appoint a receiver authorized to facilitate showings and other marketing of the Property; and

22   (ii) enjoin Shenkman from damaging the Property.

23

24   ───────────────

[8]        It is unlikely that Shenkman believed that any conventional sale could proceed in the time
25   before the Property would be subject to foreclosure.  Shenkman has simply been playing for time.
     As reflected on Exhibit B to the Mackintosh Declaration, Shenkman was notified of the
26   possibility of foreclosure not later than January 27, 2018.  *Id.* at unnumbered final page ("The
     mortgage servicer contacted the borrower to assess the borrower's financial situation and to
27   explore options for the borrower to avoid foreclosure as required by California Civil Code
     § 2923.5.  Thirty days [as of Feb. 26, 2018] have passed since the initial contact was made.").
28   Shenkman omitted to mention this in musing on many months of pre-Auction marketing he
     would demand.

1

**B.  Argument**

2      Rule 69(a)(1) of the Federal Rules of Civil Procedure (the "**Federal Rules**") provides that

3  execution on a federal money judgment must generally accord with the procedure of the state

4  where the court is located, but federal statutes govern to the extent they apply.  Federal Rule 66

5  generally provides that a receiver may be appointed by the Court but does not provide any further

6  guidance or specifics.  Likewise, Rule 65 provides for preliminary injunctions and restraining

7  orders but does not address post-judgment injunctions.  Accordingly, California law applies to

8  Forreststream's request to appoint a receiver to assist in enforcement of its Judgment and request

9  for an injunction protecting the Property.  *See Yufa v. TSI Inc.*, 2016 U.S. Dist. LEXIS 19937, at

10  *5 (N.D. Cal. Feb. 18, 2016) (California receivership law applies to post-judgment proceeding

11  because Federal Rules lack specific applicable provision).

12

### 1.  A Receiver Should Be Appointed to Facilitate Showings and Other Marketing of the Property

13

14      California law provides for the appointment of a receiver to enforce a judgment.  *See* CCP

15  §§ 564(b)(3), (b)(4), 699.070, 708.610-708.630.  Among other things, a receiver may be

16  appointed to preserve the value of property levied upon.  CCP § 699.070 provides, in relevant

17  part:

18      The court may appoint a receiver . . . to take any action the court orders that is
       necessary to preserve the value of the property levied upon, including but not
19      limited to selling the property, if the court determines that the property . . . will . . .
       greatly depreciate in value or that for some other reason the interest of the parties
20      will be best served by the order.  An order may be made under this subdivision
       upon application of the judgment creditor . . . .  The application shall be made on
21      noticed motion if the court so directs or a court rule so requires.  Otherwise, the
       application may be made *ex parte*.

22

23  CCP § 699.070(a).  Put another way, if the Court determines that property subject to levy will

24  greatly depreciate in value or that the interests of the parties will be best served by the order, the

25  Court may order a receiver to take any action necessary to preserve the value of the property.

26      In addition, CCP § 708.620 provides that

27      The court may appoint a receiver to enforce the judgment where the judgment
       creditor shows that, considering the interests of both the judgment creditor and the
28      judgment debtor, the appointment of a receiver is a reasonable method to obtain

- 11 -

1   the fair and orderly satisfaction of the judgment.

2   CCP § 708.620.

3       The breadth of the Court's authority and discretion in fashioning a receiver's powers and

4   authorities is confirmed by CCP § 568, made applicable here by CCP § 708.610, which provides

5   that a receiver may, among other things, "take and keep possession of the property, . . . receive

6   rents, . . . make transfers, and generally . . . do such acts respecting the property as the Court may

7   authorize."  CCP § 568.

8       Here, Forreststream requests appointment of a receiver with narrow authority to provide

9   access to permit showings and other marketing of the Property (including related books and

10  records), which is subject to the U.S. Marshal's levy.  Importantly, though such relief is clearly

11  authorized by CCP § 568, Forreststream does **not** seek to dispossess Shenkman of the Property

12  prior to its sale.  It seeks only to provide concurrent rights of possession to the receiver so that the

13  receiver may show or facilitate the showing of the Property and related books and records to

14  prospective bidders on reasonable notice as provided in the Proposed Order.

15      This relief is authorized pursuant to CCP § 699.070(a) because it is necessary to preserve

16  the value of the Property interest subject to levy and both (i) such interest is greatly depreciating

17  in value; and (ii) the relief is in the best interests of the parties.  Further, because the relief is in

18  the best interests of the parties, it is also authorized pursuant to CCP § 708.620.

19      What specifically has been levied upon in this case is the interest of the Shenkmans in the

20  Property.  *See* Sale Order, 3:4-8.  That interest is subordinate to the interest of the Shenkmans's

21  mortgage lender (now IberiaBank, *see* Mackintosh Decl. Ex. C at 2).  Currently, IberiaBank's

22  interest—a mortgage lien of more than $4.5 million—is worth more than half of the economic

23  value of the Property.  With each passing month, IberiaBank's interest in the Property increases

24  by as much as approximately $70,000, with a corresponding decrease in the value of the interest

25  subject to levy.  With property values flat,[9] the accrual of 18% interest on more than half the

26

27  _____
    [9]    According to Mr. Markovich's appraisal of the Property, the value of similar homes in
    Marin County has remained flat over the past three years.  *See* ECF 226, 26 ("All sales with
28  5000 sf of living area were charted to show the median price trend over time.  The trend shows
    stable conditions . . . .").

1    value of the Property translates to a greater than 9% annual depreciation in the value of the

2    interest levied upon.  Assuming, for example, a $7.5 million sale price subject to a $5 million

3    mortgage, a $70,000 reduction in the $2.5 million of equity translates to a 2.8% reduction in a

4    single month—or more than 33% on an annualized basis.  Forreststream submits that this rate of

5    deprecation is "great" for the purposes of CCP § 699.070(a).  Permitting shows of the Property to

6    expedite a sale is necessary to prevent further depreciation.

7         Indeed, preventing potential bidders from seeing the Property significantly increases the

8    risk that no bidder will bid at the auction and that no bidder will bid at or above the minimum sale

9    price approved by the Court.  *See* Bullock Decl., ¶ 9.  If the Auction on April 27, 2018 does not

10   result in a sale of the Property, it is unlikely that Forreststream will be able to schedule and

11   successfully consummate another auction prior to June 25, 2018 when IberiaBank's right of

12   foreclosure matures.[10]  The consequence of Foreclosure would likely be to eliminate

13   Forreststream's interest in the Property entirely without returning value to Forreststream.  Clearly,

14   this would constitute "great" depreciation of the interest levied for the purposes of CCP

15   § 699.070(a).

16        The impact that Shenkman's "shutting the door" will have on the value of the interest

17   levied is illustrated by the range of appraisals previously submitted to the Court.  Ms. Hill was

18   unable to inspect the property in conducting her appraisal.  ECF 141-1, 39-40.  She was therefore

19   limited to information contained in the public records and her own assumptions to make her value

20   estimate.  *Id.*  She reasonably assumed that the home was in "midrange average condition," *id.* at

21   40, and that its construction quality was "Q4" on a scale that ranks from Q6 (lowest) to Q1

22   (highest),[11] *id.* at 46.  As a result, she concluded that the Property was worth $5.5 million.  Mr.

23   Markovich, on the other hand, was able to inspect the Property and reached a very different

24   conclusion.  Impressed by the "custom quality construction with a high level design, materials

25

26   [10]      Importantly, if the Auction does not generate a bid sufficient to pay off the senior liens
     and Shenkman's $100,000 homestead exemption, Forreststream would have to wait a year before
27   it could attempt to sell the Property again, at which time the Property surely would have been
     foreclosed by IberiaBank.
28   [11]      *See* Fannie Mae Selling Guide, Quality of Construction Rating, *available at*
     https://www.fanniemae.com/content/guide/selling/b4/1.3/06.html.

1    and finishes" and based on his ratings of "excellent" for construction quality and "good" for

2    overall condition, ECF 226 at 11-12, Mr. Markovich concluded the property was worth

3    $9 million.

4         If Shenkman is permitted to "shut the door" to bidders at the Auction and leave them to

5    make the same assumptions that Ms. Hill did, the value of the levied interest will be in the range

6    of $500,000 after accounting for the Mortgage.  At a $5.5 million price, the Court may not

7    approve the sale at all, leaving IberiaBank to foreclose on the Property and Forreststream with

8    nothing.[12]  On the other hand, if potential bidders are able to see the Property and share Mr.

9    Markovich's enthusiasm for it, the value of the levied interest will be $4 million, which would

10   satisfy most of Forreststream's outstanding Judgment.

11        For these reasons, appointing a receiver on the terms stated in the Proposed Order is

12   necessary to preserve the value of the Property.

13        Appointing a receiver is also in the best interests of the parties.  While, in the short run,

14   Shenkman would like to prevent the Auction and remain in the Property until it is foreclosed by

15   IberiaBank, this is damaging to his interests and Forreststream's alike.  Allowing a value-

16   maximizing Auction to occur will reduce the amount of Forreststream's judgment against

17   Shenkman, stop secured mortgage interest accrual of up to $70,000 per month, and prevent a

18   foreclosure in which none of Forreststream's judgment is likely to be paid.  In addition, the

19   Shenkmans will be entitled to receive payment of their $100,000 homestead exemption in an

20   auction, whereas they may lose that value entirely in a foreclosure.  For Forreststream, permitting

21   showings in advance of the Auction will mean a reasonable chance of recovering some value

22   from what appears to be Shenkman's most significant asset.

23        Forreststream requests that the Court appoint a receiver on the terms stated in the

24   Proposed Order, including terms prohibiting Shenkman from interfering with the receiver's

25

---

26   [12]     Given that foreclosure will likely eliminate both Forreststream's and Shenkman's
     interests, Forreststream submits that cause exists to approve the sale of the Property at any price
27   above the amount of the senior debt and homestead exemption pursuant to CCP § 704.800(b)(1)
     and Forreststream specifically reserves its right to seek such relief.  Forreststream believes such
28   relief is especially warranted due to Shenkman's refusal to cooperate in a value-maximizing
     auction process.

- 14 -

1    discharge of his duties.

2                    **2.   Mr. Shenkman Should Be Enjoined from Damaging the Property**

3            Typical California residential property purchase agreements provide for property to be

4    sold "as is" in its "PRESENT physical condition as of the date of Acceptance."[13]   This means that

5    a buyer is assured that the condition in which it saw the property is the same condition in which it

6    will take possession of the property.   Clearly, a buyer unable to obtain such an assurance would

7    discount its offer price accordingly.   *See* Bullock Decl. at ¶ 10.

8            In a standard execution sale, a buyer takes the property in whatever condition it finds it.

9    To counter the deleterious effect this would have on bids for the Property, Forreststream requests

10   that the Court provide some modest assurance of condition to prospective buyers by enjoining

11   Shenkman, pursuant to CCP § 745, from damaging the Property.   In relevant part, CCP § 745

12   provides:

13           The court may, by injunction, on good cause shown, restrain the party in
             possession from doing any act to the injury of real property . . . after levy on the
14           property and before the possession of the property is transferred pursuant to sale
             under the levy.
15

16   CCP § 745.

17           Forreststream submits that the potential enhancement in sale price resulting from the

18   requested injunction constitutes good cause.   Bidders assured that there will be no intentional

19   damage to the Property, including removal of fixtures,[14] between the time that they view it and

20   take possession are likely to bid higher than those without such an assurance.   Bullock Decl. at

21   ¶ 10.   This is especially true where, as here, the Property contains high-end custom fixtures and

22   other features that would be expensive to replace.   Balancing this benefit against the burden on

23   Shenkman supports Forreststream's conclusion.   It is no burden on Shenkman to restrain him

24   from causing damage to the Property.

25   [13]      Illustrative form available at https://weissman-realestate.com/wp-
     content/uploads/2017/09/Residential-Purchase-Agreement-RPA_SAMPLE.pdf, *see* § 11.
26   [14]      Fixtures, defined as, among other things, things "permanently attached" to land or
     buildings permanently resting upon land, "as by means of cement, plaster, nails, bolts, or screws,"
27   constitute real property.   Cal. Civ. Code §§ 658, 660.   Forreststream's lien attached to all of
     Shenkman's real property in Marin County, including that constituting the Property.   CCP
28   § 697.310(a).

- 15 -

Notably, injunctive relief similar to the relief requested herein is commonly issued with receivership orders in California.  California's form of *ex parte* receivership order, Form RC-200,[15] contains standard form injunctive language that prohibits, among other things, (a) committing or permitting any waste (including disposing of fixtures); (b) "interfering in any manner with the discharge of the receiver's duties under the order"; and (c) doing any act to impair the preservation of the property or the applicant's interest in the property.

For these reasons, Forreststream requests that the Court enter the injunction as set forth in the Proposed Order.

### C. *Ex Parte* Relief Is Proper Under the Circumstances

To the extent applicable, California Rule of Court 3.1175 requires a party seeking appointment of a receiver on an *ex parte* basis to show:

(1)     The nature of the emergency and the reasons injury would be suffered by the applicant during the time necessary for a hearing on notice;

(2)     The names, addresses, and telephone numbers of the persons in actual possession of the property for which a receiver is requested, or of the president, manager, or principal agent of any corporation in possession of the property;

(3)     The use being made of the property by the persons in possession; and

(4)     If the property is a part of the plant, equipment, or stock in trade of any business, the nature and approximate size or extent of the business and facts sufficient to show whether the taking of the property by a receiver would stop or seriously interfere with the operation of the business.

Each requirement is satisfied here.  Forreststream has set the Auction for April 27, 2018 in order to permit a reasonable marketing period for the Auction in light of the monthly cost of Shenkman's mortgage interest.  This date is also necessary to conclude the Auction process, including any motion to the Court for approval of a sale below the minimum price set in the Sale Order, prior to the June 25, 2018 date on which IberiaBank's foreclosure right may fully mature.  For the reasons set forth above, Forreststream believes that effective marketing of the Property

---

[15]     *Available at* http://www.courts.ca.gov/documents/rc200.pdf.

1   necessarily entails affording access to potential buyers.  *See also* Bullock Decl. ¶¶ 8-9.

2   Shenkman will not allow access to the Property to promote the Auction unless ordered by the

3   Court.  Regular notice for a motion to the Court is not less than thirty-five days; the Auction is

4   approximately fifty days from the date of this application.  Interest is accruing on the property at a

5   rate of up to $70,000 per month.  Accordingly, Forreststream believes it would likely lose at least

6   $70,000 of value if relief were not granted on an *ex parte* basis and could lose the entire value of

7   the Property if no showings result in no bids and the Property is lost in foreclosure to IberiaBank.

8       Forreststream is informed and believes that Shenkman is the sole occupant of the

9   Property.  His address is the Property—28 Meadow Hill Drive, Tiburon, CA.  His telephone

10  number is (415) 999-2002.  The Property is Shenkman's homestead.  The Property is not a plant,

11  equipment, or stock in trade of any business.

12      To the extent applicable, California Rule of Court 3.1178 requires a party seeking

13  appointment of a receiver on an *ex parte* basis to propose specific amounts of the undertakings

14  required by CCP §§ 529, 556(b), and 557(b).  Forreststream proposes that its applicant

15  undertakings that may be required pursuant to § 529 and § 566(b) be set at $0.  An undertaking

16  under CCP § 529 is intended to compensate the defendant for any loss resulting from any matter

17  as to which he was wrongfully enjoined.  CCP § 529(a).  Forreststream submits that the requested

18  injunctions against Shenkman—to refrain from damaging his own property and to allow the

19  receiver to do its limited work without interference—cannot conceivably harm Shenkman and

20  will actually benefit him by making it possible for him to be paid his homestead exemption.

21      Likewise, an undertaking under CCP § 566(b) is intended to compensate the defendant for

22  any loss resulting from the wrongful appointment of a receiver.  Here, because the receiver will

23  not dispossess Shenkman of the Property and leave his rights to enjoyment of the Property

24  substantially intact, it is difficult to envision any damages he might suffer as a result of the

25  receiver's appointment.  In any event, since Shenkman owes Forreststream in excess of

26  $5 million, any harm he might suffer as a result of the requested injunction and receivership can

27  be set off against his debt to Forreststream.

28      Finally, Forreststream suggests that the amount of the undertaking for the receiver

1    pursuant to CCP § 567(b) be set at $2,500 and the receiver, at the receiver's election, be permitted

2    to deposit cash in such amount in the Court's registry in lieu of obtaining a bond.  The purpose of

3    a bond under CCP § 567 is to secure the faithful performance of the receiver's duties in

4    accordance with orders of the Court.  CCP § 567(b).  Here, the receiver's duties are relatively

5    limited and ministerial.  The receiver's primary task is providing access to the Property to permit

6    showings in advance of the Auction.  The receiver will be compensated hourly for doing so.

7    Forreststream submits that the incentive structure is adequate to ensure compliance and

8    disincentives in the form of an increased undertaking are unnecessary.

9          **D.  Suggested Receiver**

10         Forreststream respectfully requests that the Court appoint G. Larry Engel (acting through

11   Engel Law, P.C.) as receiver.  Mr. Engel was a long-time partner at Morrison & Foerster LLP in

12   its bankruptcy and restructuring practice at the time of his retirement on December 31, 2015.  *See*

13   Engel Decl. at ¶ 4.  Prior to his time at Morrison & Foerster, he was briefly a partner in the San

14   Francisco offices of White & Case LLP which closed in 2006.  *Id.*  Roberto Kampfner, counsel to

15   Forreststream in this action, worked together with Mr. Engel for approximately ten years prior to

16   his departure from White & Case but has not worked with him on any matters since that time.  *Id.*

17   In his retirement, Mr. Engel undertakes work on an ad hoc basis.  *Id.* at ¶ 5.  Further biographical

18   information on Mr. Engel and current categories of assignments are set forth at

19   http://www.engeladvice.com/resume/.  *Id.*  Mr. Engel is not a party to this action, not an attorney

20   to any party in this action, and not related to the judge.  *Id.* at ¶ 6.  Mr. Engel has indicated he is

21   prepared to faithfully discharge the duties of the Receiver on the terms and conditions set forth in

22   the Proposed Order.  *Id.*

23         **E.  Order to Show Cause Procedure; Proposed Hearing Date**

24         Where a receiver is appointed on an *ex parte* basis, California procedure permits the

25   person in possession of the subject property the opportunity to challenge the appointment at an

26   order to show cause hearing not more than fifteen (15) days after the *ex parte* appointment.

27   California Rule of Court, § 3.1176(a).  A case management conference is set in this matter for

28   March 22, 2018.  Forreststream proposes that, subject to the Court's availability, the order to

1   show cause be heard the same day.

2      **F.  Conclusion**

3      For all of the foregoing reasons, Forreststream requests that this Court grant (a) the relief

4 requested herein by entering the Proposed Order; and (b) such other and further relief as the Court

5 deems just and proper.

6 Dated:    March 9, 2018             WHITE & CASE LLP

7                         By:   /s/ Roberto J. Kampfner

8                              Roberto J. Kampfner
                             *Attorneys for Plaintiff*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  Roberto J. Kampfner  (SBN 179026)
   Andrew Mackintosh  (SBN 266772)
2  WHITE & CASE LLP
   555 South Flower Street, Suite 2700
3  Los Angeles, CA 90071
   Telephone:  (213) 620-7700
4  Facsimile:   (213) 452-2329
   rkampfner@whitecase.com
5  amackintosh@whitecase.com

6  *Attorneys for Plaintiff*

7
                    **UNITED STATES DISTRICT COURT**
8                   **NORTHERN DISTRICT OF CALIFORNIA**

9  FORRESTSTREAM HOLDINGS LIMITED, a         Case No. 3:16-cv-01609-LB
   Cyprus company,
10                                            **[PROPOSED] ORDER GRANTING**
                 Plaintiff,                   ***EX PARTE* APPLICATION FOR**
11                                            **(A) APPOINTMENT OF A**
         v.                                   **RECEIVER FOR LIMITED**
12                                            **PURPOSE OF FACILITATING**
   GREGORY SHENKMAN (AKA GRIGORY              **MARKETING FOR 28 MEADOW**
13 SHENKMAN), an individual,                  **HILL; AND (B) INJUNCTION**
                                              **RESTRAINING JUDGMENT**
14               Defendant.                   **DEBTOR FROM CAUSING**
                                              **INJURY TO THE PROPERTY**
15
                                              **Fed. R. Civ. P. 69(a)(1); Cal. Code**
16                                            **Civ. P. §§ 704.750** *et seq.*

17                                            Action filed:      March 31, 2016
                                              Judgment Entered:  April 6, 2017
18

19      Upon the *ex parte* application of Forreststream Holdings Limited for an order, pursuant to

20 sections 568, 699.070(a), 708.610, 708.620, and 745(b) of the California Code of Civil Procedure

21 (the "**CCP**"), made applicable in this action pursuant to Rule 69(a)(1) of the Federal Rules of

22 Civil Procedure, and upon the declarations of Andrew Mackintosh, William N. Bullock, and G.

23 Larry Engel filed in support thereof:

24      DEFENDANT GREGORY SHENKMAN is hereby ORDERED to appear before the

25 Court on March _____, 2018 (the "**Order to Show Cause Hearing**"), and give any reason

26 why the relief granted herein on an *ex parte* basis should not be confirmed.

27      Pending the Order to Show Cause Hearing, and until entry of an order upon the Order to

28 Show Cause Hearing terminating this Order, if any:

                                    - 1 -

**THE COURT HEREBY FINDS:**

A.  The interests of Gregory Shenkman and Yelena Shenkman in the property commonly known as 28 Meadow Hill Drive, Belvedere-Tiburon, CA 94920 and identified by the Marin County Recorder-Assessor as parcel 058-341-15 (the "**Property**") have been duly levied by the U.S. Marshal.

B.  As a result of actual and likely mortgage interest accrual, such interests are greatly depreciating within the meaning of CCP § 699.070(a).

C.  Appointment of a receiver to facilitate showing (including books and related records) and other marketing of the Property in advance of the scheduled April 27, 2018 execution sale (the "**Auction**") is necessary to preserve the value of such interests because permitting access for showings and other marketing is likely to result in greater interest in the Property from a potential buyer.  Without limiting the generality of the forgoing, permitting access for showings and other marketing materially increases the likelihood of a bid in excess of the minimum sale price previously fixed by the Court and thereby increases the likelihood that the sale of the Property will not be further delayed.

D.  A value-maximizing Auction is in the best interests of the parties.  Without limiting the generality of the foregoing, a conventional sale of the Property is impracticable under the circumstances due to (i) the presence and threatened presence of junior liens in excess of the value of the Shenkmans' interest in the property subject to levy, and (ii) the speed of the Auction relative to a conventional sale in light of the likely mortgage interest accrual.  Further, the home is subject to a recorded notice of default and the mortgage lender's right to foreclose on the property and eliminate Forreststream's judgment lien could mature as early as June 25, 2018.  In a foreclosure, Forreststream could receive nothing on account of its lien and the Shenkmans could receive no payment on account of their claimed homestead exemption in the Property.

- 2 -

E. The potential increase in the amount a buyer would be willing to pay for the Property as a result of an injunction pursuant to CCP § 745 constitutes good cause for such an injunction, and outweighs any burden or prejudice Shenkman might suffer as a result of such an injunction.

**THE COURT HEREBY ORDERS:**

A. Pursuant to CCP §§ 699.070(a) and 708.620, G. Larry Engel (acting through Engel Law, P.C.) is hereby appointed as receiver for the Property (the "**Receiver**") on the terms and conditions set forth herein.

B. Pursuant to CCP § 568, made applicable by CCP § 708.610, the Receiver shall have the following rights, powers, and authorities:

   1. <u>Provide access to the Property to Facilitate Marketing.</u>  The Receiver shall be entitled to possession of the Property to the extent necessary to (i) provide access to the Property to such persons as the Receiver deems necessary or appropriate for the purposes of promoting the Auction, including to perform (a) showings to potential buyers (whether individually or to the public in "open house" format) and reasonable and customary preparations for such showings (including cleaning); (b) other marketing related activities, such as photographing; and (c) such other actions customary in connection with the sale of residential real property, such as inspections; and (ii) otherwise carry out the duties of the Receiver under this Order.  Except as otherwise provided herein, (a) the Receiver shall be entitled to have or provide such access on twenty-four hours' notice to Shenkman by telephone to (415) 999-2002 and email to gs@gsco.org, except in the case of scheduling "open houses," for which the Receiver shall provide five (5) days' notice; and (b) All access to the property granted by the Receiver shall be between the hours of 10 a.m. and 7 p.m.

   2. <u>View and Copy Books and Records Related to the Property.</u>  The Receiver shall be entitled to view and copy all books and records related to the Property, including, without limitation, plans, plats, blueprints, warranties, inventories, invoices,

- 3 -

1    inspections, reports, receipts and schematics, and permit inspection of such books

2    and records by such persons as the Receiver deems necessary or appropriate for

3    the purposes of promoting the Auction.

4    C.  The Receiver shall be automatically discharged upon the first to occur of: (a) the

5    transfer of the Property pursuant to the Auction; (b) the date that is fourteen days after

6    written notice by the Receiver requesting discharge following the date of the Auction,

7    as may from time to time be continued; (c) a further order of the Court discharging the

8    Receiver; and (d) July 1, 2018 (as may be extended by the Court).

9    D.  The Receiver shall be compensated as follows, to be paid by Forreststream: (a) in the

10    amount of $600 per hour, up to an aggregate of $15,000; and (b) in the amount of the

11    Receiver's actual and necessary documented out of pocket expenses.

12    E.  At the Receiver's election, to secure the Receiver's discharge of his duties hereunder

13    in accordance with CCP § 567(b), the Receiver shall either (a) deposit cash in the

14    Court's registry in the amount of $2,500; or (b) file a bond in the amount of $2,500

15    with the Court.  The deposit shall be returned, or the bond exonerated, on the date that

16    is fourteen (14) days after the date of the Receiver's discharge *unless* a written

17    objection to such release or exoneration is filed with the Court.

18    F.  Prior to undertaking his duties as Receiver hereunder, the Receiver shall file with the

19    Court a receiver's oath committing, in all material respects, to faithfully perform the

20    duties of the Receiver hereunder and observe all instructions and orders of this Court

21    in accordance with the laws of the State of California and other applicable laws and to

22    the best of the Receiver's ability.

23    G.  Any claims against the Receiver arising in connection with his appointment pursuant

24    to this Order shall be brought in the first instance in this Court.  The Receiver shall be

25    liable in connection with the discharge of his duties pursuant to the Order only for his

26    own actions or omissions constituting gross negligence or willful misconduct.

27    Without limiting the generality of the foregoing, the Receiver shall have no liability

28    for any acts or omissions of Shenkman or Shenkman's invitees.

- 4 -

H.  The Receiver and the parties may at any time apply to this Court for further instructions and orders and for additional powers necessary to enable the Receiver to perform the Receiver's duties properly.

I.  Within three (3) days of entry of this Order, Shenkman shall:

1.  provide to the Receiver all keys and access and/or security devices or codes necessary to access all areas of the Property and sufficient instructions to the Receiver on how to operate all access fences, gates, doors, access systems, and security systems.

2.  Notify the Receiver of the insurance coverage on the Property, provide copies of applicable policy documents, and cause the Receiver to be added as an additional insured.

J.  Within five (5) days of entry of this Order, Shenkman shall provide to the Receiver (i) all books and records relating to the Property within Shenkman's possession, custody, or control, including plans, plats, blueprints, and schematics relating to the Property; and (ii) a catalogue of each item of personal property within the Property of a value in excess of $1,000 and the Receiver shall verify such list.

K.  Shenkman is hereby ENJOINED, pursuant to CCP § 745, from causing injury to the Property.  Without limiting the generality of the foregoing, Shenkman shall neither remove nor cause the removal from the Property of any item that is attached to the Property by nails, screws, bolts, wires, brackets, plaster, cement, glue, or other fastener or fastening product.  Shenkman shall be liable under CCP § 746 for any violation of this injunction, provided, however, that Shenkman shall not be liable for ordinary wear and tear to the Property.

L.  Shenkman is hereby further ENJOINED from (a) interfering in any manner with the discharge of the Receiver's duties under this Order; and (b) doing any act, or omitting to do any act, that will impair the preservation of the Property or Forreststream's interest in the Property.  To the extent that Shenkman has or gains knowledge of any material damage to the Property or any unsafe condition he shall promptly report such

- 5 -

damage or condition to the Receiver and the Receiver shall be authorized to take such actions as the Receiver deems necessary or appropriate to remediate such damage or condition, which actions may be taken on notice to Shenkman and at such times as are reasonable, in the determination of the Receiver, under the circumstances.

M. Forreststream shall post no bond pursuant to CCP §§ 529 or 567(b).  To the extent that it is determined, by a final order of this Court, that Shenkman was damaged by Forreststream's wrongful procurement of the relief granted in this Order, Shenkman shall be entitled to offset the actual amount of his damages as determined by this Court against the outstanding amount of the Judgment.

N. Forreststream shall serve a copy of this Order together with the application for this Order via email and overnight delivery within one (1) business day of its entry on Gregory Shenkman c/o Walter Cook, 2995 Woodside Rd., #400, Woodside, CA 94062, WaltCook@Gmail.com.

O. Opposition to this Order, if any, shall be filed and served by Shenkman on or before March _____, 2018.  Any reply to any opposition to this Order shall be filed and served by Forreststream on or before March _____, 2018.

Dated: _____

_____
LAUREL BEELER
UNITED STATES MAGISTRATE JUDGE

- 6 -